SUMMONS ISSUED                    CV 14          3795

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

FLIGHT ATTENDANTS IN REUNION;   :
DIXIE DANIELS; COLLEEN HAWK;    :
MERRY LARSON; and               :
JAMES GORDON TULLER,            :
                                :
                Plaintiffs,     :
                                :
        v.                      :
                                :                    **COMPLAINT**
AMERICAN AIRLINES, INC.,        :          ROSS, J.
                                :
and                             :
                                :
ASSOCIATION OF PROFESSIONAL     :          MANN, M.J.
FLIGHT ATTENDANTS,              :
                                :
                Defendants.     :

**FILED**
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y
★ JUN 1 7 2014 ★
BROOKLYN OFFICE

        Plaintiffs, FLIGHT ATTENDANTS IN REUNION, DIXIE DANIELS,

COLLEEN HAWK, MERRY LARSON, and JAMES GORDON TULLER, by and through

their attorney, Z. LANCE SAMAY, ATTORNEY AT LAW, A PROFESSIONAL

CORPORATION, for their complaint against Defendants, AMERICAN

AIRLINES, INC. and ASSOCIATION OF PROFESSIONAL FLIGHT ATTENDANTS,

allege as follows:

                        **NATURE OF ACTION**

        1.  Plaintiffs bring this action against defendants for

preliminary and permanent injunctive relief under 49 U.S.C.

§42112(a), the McCaskill-Bond Amendment to the Federal Aviation Act

("McCaskill-Bond"), and declaratory relief under 28 U.S.C. §§2201 and 2202, the Declaratory Judgment Act.

2.    This action arises as the result of a violation by ASSOCIATION OF PROFESSIONAL FLIGHT ATTENDANTS ("APFA") of its labor union Duty of Fair representation regarding all former Trans World Airlines ("TWA") Flight Attendants who are now American Airlines, Inc. ("AA") Flight Attendants ("TWA/AA FA(s)") and who will as the result of that violation, in the absence of appropriate relief from this court, soon be integrated unfairly and inequitably into the work force of the new airline that was formed by the merger on December 9, 2013 of AA and US Airways ("US Air"), in much the same way that they were wrongfully deprived of their rightful seniority in 2001 when APFA wrongfully "stapled" them to the bottom of AA's Occupational Seniority List; and as the result of AA's wrongful acquiescence and complicity in the continued unfair and inequitable subordination of all such TWA/AA FAs in violation of AA's obligation under McCaskill-Bond to make provision "for the integration of [airline employee] seniority lists in a fair and equitable manner."

## JURISDICTION AND VENUE

3.    Pursuant to 28 U.S.C. §1391, this Court has subject matter jurisdiction under McCaskill-Bond, 49 U.S.C. §42112(a) and

the Railway Labor Act, 45 U.S.C. §151, et seq. ("RLA"), and because, pursuant to 28 U.S.C. §§2201 and 2202, plaintiff's seek a declaration of the parties' rights and obligations under McCaskill-Bond. This Court also has jurisdiction pursuant to 28 U.S.C. §1337 because this is an action under a statute that regulates commerce and/or protects trade and commerce against restraints.

4.   Venue is proper in this district under 28 U.S.C. §1391 by virtue of the fact that this court has personal jurisdiction over defendants, among other reasons, because: defendants have physical bases for their operations in this district and continually do business in this district; defendant APFA represents thousands of flight attendants who travel through and are stationed at airports within this district and extends its representation to flight attendants concerning their employment in this district, and, upon information and belief, some of its representatives reside in this district; and AA is registered to do business within the State of New York.

## PARTIES

5.   Plaintiff FLIGHT ATTENDANTS IN REUNION ("FAIR") is an unincorporated association of the State of New Jersey duly formed in accordance with N.J.S.A. 2A:64-1 for the purpose of serving as

a jural entity under Fed. R. Civ. P. 17(b) to enforce the substantive rights of all of its members under the laws of the United States and the pursuit and achievement of the common interests and goals of all such members, all of whom are TWA/AA FAs. The principal office of FAIR is at 3640 Valley Road, Suite C, Liberty Corner, NJ  07938.

6.    Plaintiff DIXIE DANIELS ("Daniels") is a TWA/AA FA having her principal residence at 40 E. 100 South Kamas, UT 84036. Her TWA date of hire is February 21, 1973 and her current AA Occupational Seniority numbers is 12,834. By way of example, if Daniels had been properly integrated into the AA workforce of flight attendants her proper Occupational Seniority number would be about 400.

7.    Plaintiff COLLEEN HAWK ("Hawk") is a TWA/AA FA having her principal residence at 3034 GULL PLACE, CLEARWATER, FL  33762. Her TWA date of hire is February 17, 1986 and her current AA Occupational Seniority numbers is 13,429.  If Hawk had been properly integrated into the AA workforce of flight attendants her proper Occupational Seniority number would be about 3,500.

8.    Plaintiff MERRY LARSON ("Larson") is a TWA/AA FA having her principal residence at 10 BELMONT, WEST LONG BRANCH, NJ  07764. Her TWA date of hire is July 14, 1971 and her current AA

- 4 -

Occupational Seniority numbers is 12,816. If Larson had been properly integrated into the AA workforce of flight attendants her proper Occupational Seniority number would be about 150.

9. Plaintiff JAMES GORDON TULLER ("Tuller") is a TWA/AA FA having his principal residence at 1601 S 18TH STREET, ST. LOUIS, MO 63104. His TWA date of hire is June 28, 1972 and his current AA Occupational Seniority numbers is 12,828. If Tuller had been properly integrated into the AA workforce of flight attendants his proper Occupational Seniority number would be about 331.

10. Upon information and belief, defendant AA is a commercial "air carrier" within the meaning of 49 U.S.C. §42112, note §117(b)(1), with national and international airline operations. It is a wholly owned subsidiary of AMERICAN AIRLINES GROUP INC. ("AAG") and has its principal place of business at 4333 Amon Carter Boulevard, Fort Worth, Texas 76155.

11. Upon information and belief, defendant APFA is a labor organization acting as a "representative" as defined by the RLA, 45 U.S.C. §151, and is the certified collective bargaining representative of the flight attendants of AA, having its principal place of business at 1004 West Euless Boulevard, Euless, Texas 76040.

## BACKGROUND AND OPERATIVE FACTS

12.  On January 10, 2001, financially beleaguered TWA, one of the oldest and most respected premier airlines to grace the skies, entered into an Asset Purchase Agreement with AMR Corporation, AA's parent company (except as otherwise indicated, together "AA"), dated January 9, 2001, to sell to AA substantially all of TWA's assets for the sum of $500 million dollars in cash (commonly described as the "TWA Merger").

13.  Upon information and belief, as part of the Asset Purchase Agreement TWA was obliged to file for bankruptcy, and because other bidders came to the fore in that proceeding the price that was eventually paid by AA rose to $744 million dollars.

14.  Upon information and belief, during the process leading up to the TWA merger, AA made many promises in order to gain congressional and Department of Justice approval of the TWA Merger. Of those promises, the one most relevant to this action is set forth in the "Asset Purchase Agreement" dated January 9, 2001 that initiated the process by which AA acquired TWA's assets.

15.  More specifically, at Article X, Sub-Article 10.1 the Asset Purchase Agreement provided that TWA/AA FAs, as part of a larger protected class of TWA employees, would receive "employment benefits . . . **at levels substantially no less favorable** than those

- 6 -

benefits provided to [AA's] similarly situated employees."
(Emphasis added in bold).

16. However, after AA's purchase of TWA's assets had been
finalized, AA ignored this contractual promise and acquiesced in
the unilateral action of APFA to deprive all TWA/AA FAs of their
earned TWA "date of hire seniority" and to staple them to the
bottom of AA's Occupational Seniority List.

17. This seniority list determines most of the critical
aspects of a flight attendant's employment, including the ability
to select monthly schedules; to avoid onerous and unpredictable
reserve-status (on-call) assignments (currently, during three full
months of every year); to transfer to other than assigned bases; to
retain employment during furloughs (lay-offs), and to qualify for
employment-related benefits, pensions, stock distributions, and
union voting rights.

18. Upon the consummation of the TWA Merger, TWA Airlines,
LLC ("TWA, LLC"), a newly formed, wholly owned subsidiary of AA,
held all of the assets that AA had purchased from TWA and continued
to operate those assets with TWA's employees until TWA LLC was
merged into AA.

19. TWA, LLC commenced operations on April 10, 2001 and, for

the reasons and on the terms reflected below, it did so exclusively with former TWA personnel.

20. Under Federal Aviation Regulations, only certain classifications of employees, such as Flight Attendants ("FA(s)"), Pilots, Mechanics, and Dispatchers are certified to operate aircraft, and only such certified employees in such classifications may perform the required functions.

21. Only FAs certified under the operating certificate granted by the Federal Aviation Administration ("FAA") to TWA, Inc. and transferred to TWA, LLC were legal in performing Flight Attendant duties for TWA, LLC on and after April 10, 2001.

22. Former TWA FAs were never "hired" by TWA, LLC, but only continued their employment without interruption upon the transfer of the operating certificate from TWA to TWA, LLC. No employment contracts or any other documents were signed prior or subsequent to performing the duties of a FA with TWA, LLC or, upon information and belief, upon recall to AA subsequent to furlough from TWA, LLC.

23. After September 11, 2001, several furloughs occurred. Initially, there were two seniority lists, one for American FAs and one for TWA, LLC FAs. The first furloughs occurred on or around October 1, 2001. FAs from both lists were furloughed and

subsequently deleted from the recall list(s) upon expiration of a contractually provided five-year recall period.

24. On December 17, 2001, APFA and AA signed a Seniority Integration Agreement ("SIA"), pursuant to which all 4,200 or so TWA, LLC FAs were wrongfully deprived of their rightful TWA Date of Hire Seniority.

25. The International Association of Machinists and Aerospace Workers ("IAM") which had then represented the TWA, LLC FAs had been wrongfully barred from participation in the development and signing of the SIA, all terms of which were determined solely by APFA.

26. In or around October 2002, the first TWA, LLC FAs transitioned from TWA, LLC to AA, thus triggering the merger of the two pre-existing seniority lists into one list, whereby all former TWA, LLC FAs, now TWA/AA FAs, were discriminatorily and maliciously "stapled" to the bottom of the one integrated seniority list and became subordinate to every other AA FA who had been hired on or before the acquisition date of April 10, 2001 that APFA had arbitrarily assigned to all TWA/AA FAs as their "AA Occupational Seniority Date."

27. As a result, all TWA/AA FAs became subject to furlough before any AA FAs that had been hired prior to April 10, 2001.

28. Several furloughs occurred after the merger of the seniority lists. The first occurred on or around November 1, 2002, and the last on or around July 2, 2003. As a result, all TWA/AA FAs were laid off, many permanently.

29. In an effort to prevent the recurrence of the travesty that was visited upon TWA/AA FAs by APFA, on December 26, 2007 Congress enacted McCaskill-Bond and established a requirement and process for achieving a "fair and equitable" seniority integration of employee groups affected by the combination of two or more airlines - a requirement and process prescribed by Sections 3 and 13 of the labor protective provisions that had been imposed by the Civil Aeronautics Board in the Allegheny-Mohawk Merger in 1971 (as published at 59 C.A.B. 45) and had been subsequently mandated for airline mergers from 1971 until the passage of the Airline Deregulation Act of 1978 (Pub.L. 95-504, Oct. 24, 1978, 92 Stat. 1705).

30. However, because McCaskill-Bond was prospective in application, it did nothing to help the very group whose misfortunes had given it life. Nonetheless, it may have prompted members of the airline industry to consider, at least, the need to be fair with integrated employees, or, in the case of others, the need to acknowledge that they have not been fair.

31.   Notably, regarding the treatment of TWA/AA FAs, current APFA President LAURA GLADING has publicly stated that, "[W]e really screwed up on that one big time with the flight attendants.  When we merged with TWA, the company did give them top pay but we stapled them to the bottom of our seniority list.  That was a mistake."

32.   Nevertheless, APFA has done nothing to rectify its acknowledged "mistake."  On the contrary, it has steadfastly persisted in its opposition to set right its outrageous inequity toward the TWA component of its membership, and has made clear that it will never rectify that inequity; despite its clear obligation under McCaskill-Bond to do so.

33.   Since the time of the TWA Merger, APFA has continuously refused to integrate TWA/AA FAs into the existing work force of AA Flight Attendants on the basis of their actual dates of hire by TWA and has continuously and unfairly discriminated against them as an inferior sub-class of its union membership.

34.   Because of APFA's utterly unfair demotion of TWA/AA FAs to the bottom of this seniority list and its insistence on keeping them there, all TWA/AA FAs were laid off for many years and, when recalled, they were the last in line to bid for and to hold the bases closest to their homes and families and to select flights and

flight positions that were commensurate with their actual dates of hire seniority. In other words, because TWA/AA FAs were at the bottom of AA's Occupational Seniority List, they got the least desirable positions, on the least desirable aircraft, on the least desirable flights, to the least desirable locations, at the least desirable times, from the most difficult-to-get-to bases, to perform the most demanding jobs; and, to add greater injury and insult to injury, they were the first in line to be laid off during every AA cutback following "9/11" and to suffer the consequent loss of their rightful compensation and employment-related benefits, pensions, stock distributions, and union voting rights.

35. As the result of this arbitrary, discriminatory and malicious treatment by APFA, which is duty bound, by law, to serve the interests of all of its members without discrimination or hostility toward any, all TWA/AA FAs lost their jobs, and all of the foregoing rights and benefits, many for years on end and many forever.

36. Because of the grossly unfair, wholly irrational and continuing deprivation of TWA/AA FAs' earned seniority by APFA - a union that is supposed to, but does not, represent all of its members fairly - all TWA/AA FAs have not only been furloughed for years on end, but they have also sustained profound losses,

including, without limitation, lost wages and Social Security, pension and medical benefits that have been reliably estimated to exceed Two Billion Dollars in value.

37. In the aggregate, they lost millions of dollars of income, and suffered and continue to suffer virtually every kind of conceivable injury, including many immediate and irreparable injuries, which cannot be monetized, that range from the loss of adequate sleep when they are awakened in the middle of the night to take an unwanted trip that should have been taken by a much junior flight attendant, as they themselves had done when they were truly junior, to missing important holidays, birthdays, baptisms, first communions, bar/bat mitzvahs, confirmations, weddings, funerals, the deployment and return of their veteran children from the war zones in which they serve our country, special events of every kind, with family and friends, to suffering the inability to care for aging parents and infirm children, to losing all of their assets, losing forever the opportunity to retire and to enjoy the companionship of spouses, children, grandchildren, loved ones and friends, and, in some cases, to suffering death from lack of ability to pay for indispensable health care or suicide because their lives had become so unbearable.

38.  Since their recent recalls, the situation has changed little for all TWA/AA FAs because the number of AA Flight Attendant retirees and new hires has not been sufficient to make an appreciable difference in the relative seniority status of TWA/AA FAs.  They are still at or near the bottom of AA's Occupational Seniority List and they are still subject to the same adverse employment conditions, vagaries, vexations, vulnerabilities and immediate threats of irreparable harm as recited above.  And such conditions continue, not only because of APFA's truculence but also because of AA's acquiescence to the situation.

39.  Another negative result of AA's acquiescence to APFA's egregiously discriminatory treatment of its TWA/AA FAs is that AA itself has incurred and continues to incur substantial and unnecessary expenses in connection with the regular transportation of hundreds of TWA/AA FAs from their homes to their assigned base cities when they commute to and from work, often for thousands of miles.  More likely than not, such expenses are quietly passed on to the consumer as increased fares - a practice that is hardly consonant with the aim of mergers to effect economies that benefit the public at large.

40.  On November 29, 2011, AMR, AAG's predecessor in interest, and AA filed for bankruptcy protection in the United States

- 14 -

Bankruptcy Court for the Southern District of New York ("AA Bankruptcy Case").

41. On January 25, 2012, US Air CEO Doug Parker ("Parker") announced that US Air was exploring its "options as they relate to AMR's bankruptcy."

42. On April 20, 2012, US Air and AA's three unions announced conditional labor agreements that would take effect if AA and US Air were to merge and Parker sent a merger proposal to AA management.

43. On May 11, 2012, AA agreed to explore possible mergers.

44. On August 31, 2012, AA and US Air announced that they had signed non-disclosure agreements "to work in good faith to evaluate a potential combination."

45. On February 13, 2013 the boards of directors of AA and US Air agreed to merge their two companies.

46. On July 12, 2013, US Air shareholders approved the merger with AA and on August 2, 2013 AA's unsecured creditors and shareholders approved the plan.

47. On August 13, 2013, the United States Department of Justice and attorneys general from six states and the District of Columbia filed a lawsuit in U.S. District Court in Washington ("Anti-trust Action") challenging the $11 billion merger of AA and

US Air, alleging that the combination, which would create the world's largest airline, would "substantially lessen competition" for commercial air travel and would lead to higher prices and less service for consumers.

48. On November 12, 2013, the case was settled, on terms that did not affect the potential causes of action that will be described below, and on November 27, 2013, U.S. Bankruptcy Judge Sean Lane of the Southern District of New York approved a settlement resolving all opposition to the merger between AA and US Air, allowing AA to exit bankruptcy and close on a tie-up creating the world's largest carrier - (the "New AA").

49. Upon information and belief, on or about December 20, 2013, APFA and the Association of Flight Attendants - CWA ("AFA"), the AFL-CIO union that represents the flight attendants of US Air entered into an "Agreement on Bargaining and Representation/Negotiations Protocol Agreement" which provides, in part, that, subject to a confirmation by voting members of AFA on February 28, 2014, APFA would be designated as the union for all flight attendants of the New AA and that it will be certified so sometime in the summer or early fall of 2014.

50. Also on December 20, 2013, APFA and AFA entered into a separate "Seniority Protocol Agreement" whereby they agreed that

the flight attendants of US Air would be integrated into the work force of the New AA on the basis of their "dates of training" while the flight attendants of AA would be integrated into the work force of the New AA on the basis of their current and discriminatory dates of "occupational seniority."

51. Upon information and belief, AFA agreed to integrate their FAs on the basis of their dates of training while APFA insisted on integrating the AA FAs, including TWA/AA FAs, on the basis of AA's current and discriminatory occupational seniority.

52. Once again, APFA discriminated arbitrarily, maliciously and wholly irrationally against TWA/AA FAs as an inferior sub-class of its union membership; and, this time, it did so in violation of McCaskill-Bond.

53. Upon information and belief, on or about April 24 to April 30, 2014, AA, US Air, APFA and AFA entered into a Merger Transition agreement which provides, in part, that the New AA will accept from APFA and AFA an integrated seniority list in accordance with McCaskill-Bond, but it makes no provision for the restoration to TWA/AA FAs of their rightful seniority nor does it express any disagreement with the modality of integration adopted in the Seniority Protocol Agreement.

54. On the contrary, upon information and belief, it provides

that no active flight attendant may displace any other flight attendant from the latter's position in the integrated seniority list, thereby insuring that TWA/AA FAs will not be integrated, as they should be, according to their proper TWA dates of hire.

55. With the merger of the US Air and AA Flight Attendant seniority lists, approximately 6,500 US Air FAs will be merged ahead of former TWA/AA FAs.

56. Once again, unless this court will intervene, TWA/AA FAs will again be effectively "stapled" to the bottom of an even larger list of FAs, including all US Air FAs hired by US Air prior to the April 10, 2001.

57. APFA's continuing breaches of its duty of fair representation and its unfair labor practices, including, without limitation, its on-going bad-faith and discriminatory treatment of its TWA/AA Flight Attendant members, continue to imperil the livelihood and future prospects of all of the relatively few remaining TWA/AA FAs who have managed, under very difficult circumstances, to hold onto their jobs.

58. Those unfair practices and the history of APFA's abuses of TWA/AA FAs are detailed in the congressional testimony of plaintiff Tuller given on February 26, 2013 before the U.S. House Committee on the Judiciary Subcommittee on Regulatory Reform,

Commercial and Antitrust Law in a hearing regarding "Competition and Bankruptcy in the Airline Industry: The Proposed Merger of American Airlines and US Airways."

59.   Mr. Tuller's congressional testimony made clear the fact that the rectification of one of the greatest work-force injustices in aviation history is a simple fix which would do minimal harm, if any, to anyone, especially including the members of the New AA; and, it made equally clear the contrasting fact that the perpetuation of APFA's current employee integration scheme will result in permanent and irreparable injuries to most, if not all, TWA/AA FAs.

60.   Significantly, however, all such injuries can be avoided if APFA will refrain from continuing to juggle its arbitrary, discriminatory and wholly irrational seniority list for no reason other than to punish TWA/FAs, whom it obviously regards as a disfavored group, or to wrongfully elevate above that group all other AA FAs and if AA and APFA will comply with the letter and spirit of McCaskill-Bond.

61.   McCaskill-Bond governs the integration of seniority lists among airline employee groups involved in an airline merger.

62.   McCaskill-Bond provides, in pertinent part:

(a)   Labor Integration.—With respect to any covered

transaction involving two or more covered air carriers that results in the combination of crafts or classes that are subject to the Railway Labor Act (45 U.S.C. 151 et seq.), sections 3 and 13 of the labor protective provisions imposed by the Civil Aeronautics Board in the Allegheny-Mohawk merger (as published at 59 C.A.B. 45) shall apply to the integration of covered employees of the covered air carriers; except that—

(1) if the same collective bargaining agent represents the combining crafts or classes at each of the covered air carriers, that collective bargaining agent's internal policies regarding integration, if any, will not be affected by and will supersede the requirements of this section; and

(2) the requirements of any collective bargaining agreement that may be applicable to the terms of integration involving covered employees of a covered air carrier shall not be affected by the requirements of this section as to the employees covered by that agreement, so lond as those provisions allow for the protections afforded by sections 3 and 13 of the Allegheny-Mohawk provisions.

63.  The merger of AA and US Air is a "covered" transaction under McCaskill-Bond.

64.  Section 3 of the Allegheny-Mohawk Labor Protective Provisions ("LPPs"), which is incorporated as part of McCaskill-Bond, provides that employees involved in a merger of airlines will have their separate seniority lists combined into a single seniority list covering all employees in a fair and equitable manner.

65. An airline is considered a "carrier" under the Railway Labor Act. 45 U.S.C. §181.

66. The Railway Labor Act provides that the term "employee . . . includes every person in the service of a carrier . . . who performs any work defined as that of an employee. . . ." 45 U.S.C. § 151. Therefore, because airline FAs work in the service of airlines, which are considered carriers, airline FAs are covered by the Railway Labor Act.

## COUNT ONE

67. Plaintiffs repeat and re-allege the allegations made in foregoing paragraphs 1 through 66 and incorporate by reference the allegations made in each paragraph of the successive counts of this Complaint with the same force and effect as if fully set forth herein.

68. The continued subordination of the individual plaintiffs and all of the several hundred members of FAIR, and the failure and refusal of APFA to restore all currently employed TWA/AA FAs to their rightful TWA date of hire seniority in connection with the recently approved merger of AA and US Air is a violation of McCaskill-Bond, and Section 3 of the Allegheny-Mohawk LPPs that are incorporated therein.

69.   Each of the individual plaintiffs and all of the several hundred members of FAIR have suffered injuries, including irreparable injuries, of the kinds described above, including, without limitation, those described in paragraph 37, and, as a matter of reasonable probability, if not certainty, all of them are under immediate threat of the recurrence of such immediate injuries together with all other consequential injuries that will attend APFA's continuing arbitrary, discriminatory, malicious and wholly irrational refusal to accord them their rightful TWA date of hire seniority.

70.   Upon information and belief, there is no defensible reason justifying APFA's acting contrary to the generally accepted airline standard of integration whereby TWA/AA FAs would be accorded their rightful TWA date of hire seniority.   It is indisputable that, without any legitimate reason, APFA advocated for the betterment of AA FAs at the expense of the TWA/AA FAs, and that such action was and is arbitrary, discriminatory, malicious and wholly irrational, and that it has caused and will cause damages to plaintiffs of the kind described above.

<u>COUNT TWO</u>

71.   Plaintiffs repeat and re-allege the allegations made in foregoing paragraphs 1 through 70 and incorporate by reference the

allegations made in each paragraph of the successive counts of this Complaint with the same force and effect as if fully set forth herein.

72. The continued subordination of the individual plaintiffs and all of the several hundred members of FAIR, through the acquiescence and complicity of AA to APFA's failure and refusal to restore all currently employed TWA/AA FAs to their rightful TWA date of hire seniority in connection with the recently approved merger of AA and US Air is a violation of McCaskill-Bond and Section 3 of the Allegheny-Mohawk LPPs that are incorporated therein and a violation of AA's obligation under McCaskill-Bond to make provision "for the integration of [airline employee] seniority lists in a fair and equitable manner."

73. Each of the individual plaintiffs and all of the several hundred members of FAIR have suffered injuries, including irreparable injuries, of the kinds described above, including, without limitation, those described in paragraph 37, and, as a matter of reasonable probability, if not certainty, all of them are under immediate threat of the recurrence of such immediate injuries together with all other consequential injuries that will attend APFA's continuing arbitrary, discriminatory, malicious and wholly irrational refusal to accord them their rightful TWA date of

hire seniority, and if AA will continue its unlawful acquiescence and complicity thereto.

74. Upon information and belief, there is no defensible reason justifying APFA's acts and omissions that run contrary to the generally accepted airline standard of integration whereby TWA/AA FAs would be accorded their rightful TWA date of hire seniority. It is indisputable that, without any legitimate reason, APFA advocated for the betterment of AA FAs at the expense of the TWA/AA FAs, and that such action was and is arbitrary, discriminatory, malicious and wholly irrational, and that it has caused and will cause damages to plaintiffs of the kind described above.

<u>COUNT THREE</u>

75. Plaintiffs repeat and re-allege the allegations made in foregoing paragraphs 1 through 74 and incorporate by reference the allegations made in each paragraph of the successive counts of this Complaint with the same force and effect as if fully set forth herein.

76. Upon information and belief many AA training and supervisory personnel, most or all of whom are members of APFA, instruct new hires to avoid TWA/AA FAs because "they are bitter" and promote disharmony and discord within the ranks by pitting AA

FAs against TWA/AA FAs in clear contravention of good management practices, generally accepted union principles and goals, and sound public policies favoring of work place cooperation and harmony.

77. Such conduct also harms, directly and indirectly, emotionally and sometimes physically, all TWA/AA FAs who interact with or are shunned by such conditioned disciples of disharmony, and harms the traveling public which often bears the brunt of such discord.

<u>COUNT FOUR</u>

78. Plaintiffs repeat and re-allege the allegations made in foregoing paragraphs 1 through 77 and incorporate by reference the allegations made in each paragraph of the successive counts of this Complaint with the same force and effect as if fully set forth herein.

79. As a result of defendants' invidious, arbitrary, discriminatory, malicious and wholly irrational acts and omissions as described above, all individual plaintiffs and all members of FAIR are under the continuing and immediate threat of the kinds of irreparable injuries described above.

80. Based upon the provisions of McCaskill-Bond and Section 3 of the Allegheny-Mohawk LPPs that are incorporated therein, and the judicial authorities in this district and others that such acts

and omissions as described above constitute violations of APFA's duty of fair representation, plaintiffs have a strong probability of success on the merits of this action.

81. The foregoing allegations also demonstrate that the benefits of the relief here sought by plaintiffs far outweigh the harm, if any, that others might experience if this court were to grant the relief sought.

82. The public interest favors the relief sought, among other reasons because it fulfills the purposes of the federal statutes that were enacted to redress the very wrongs that gave rise to their enactment and because the strong public interest in fostering unity within unions compels such relief.

<strong><u>COUNT FIVE</u></strong>

83. Plaintiffs repeat and re-allege the allegations made in foregoing paragraphs 1 through 82 and incorporate by reference the allegations made in same with the same force and effect as if fully set forth herein.

84. The merger between AA and US Air involved two distinct airlines and their work-forces are being integrated as a result of said merger.

85. Under McCaskill-Bond, seniority lists that result from

the merger of two distinct airlines must be completed in a "fair and equitable manner."

86.  The Seniority Protocol Agreement made on December 20, 2013 between APFA and AFA is neither fair nor equitable towards TWA/AA FAs, among other reasons, because it provides that US Air FAs will be integrated on the basis of their dates of hire and that AA FAs will be integrated based upon their current occupational seniority thereby stapling TWA/AA FAs to the bottom of an even larger combined workforce than existed at the time of the original stapling.

87.  The Seniority Protocol Agreement continues and confirms the lack of "fair and equitable" treatment with which TWA/AA FAs have been and continue to be treated, and demonstrates a clear violation of McCaskill-Bond.

88.  Similarly, the Merger Transition Agreement made on or about April 24 to April 30, 2014, among AA, US Air, APFA and AFA is also unfair and inequitable and demonstrates AA's continuing acquiescence and complicity in APFA's design to arbitrarily, discriminatorily, and maliciously elevate AA FAs over wrongfully subordinated TWA/AA Fas, and its violation of the duty imposed upon it by McCaskill-Bond to make provision "for the integration of [airline employee] seniority lists in a fair and equitable manner."

89.   McCaskill-Bond requires that, where two or more carriers are combining into one single carrier, provisions shall be made for the integration of seniority lists in a fair and equitable manner.

90.   Plaintiffs are entitled to a declaratory judgment that the transactions referred to above are covered under McCaskill-Bond, that they violate McCaskill-Bond, and that McCaskill-Bond requires the integration of all current TWA/AA FAs based upon their original TWA dates of hire instead of the discriminatory seniority date of April 10, 2001.

## PRAYER FOR RELIEF

**WHEREFORE** plaintiffs request this court to enter a declaratory judgment that APFA has violated its duty to plaintiffs of fair representation, that all current TWA/AA FAs have an employment relationship with AA; that the provisions of McCaskill-Bond and Section 3 of the Allegheny-Mohawk LPPs apply to the integration of all FAs; and that those provisions, and the doctrine of the duty of fair representation require that TWA/AA FAs be integrated into the FA workforce of the New AA on the basis of their original and rightful TWA dates of hire seniority.

Plaintiffs further request this court to enter an order granting them a preliminary and permanent injunction requiring APFA and AA to immediately and permanently integrate all current TWA/AA

FAs into the combined FA workforce of the New AA on the basis of their original and rightful TWA dates of hire seniority.

Plaintiffs further request this court to enter an order awarding plaintiffs their reasonable attorney's fees and costs associated with this action and allowing them to assert whatever damages may flow from the court's declaratory judgment; and such other and further relief as this court may deem to be equitable and just.

DATED: JUNE 17, 2014
LIBERTY CORNER, NEW JERSEY

Respectfully submitted,

**Z. LANCE SAMAY**
**ATTORNEY AT LAW**
**A PROFESSIONAL CORPORATION**
ATTORNEY FOR PLAINTIFFS

BY:

Z. LANCE SAMAY, ESQ.
A SHAREHOLDER OF THE FIRM

TWA AA COMPLAINT 061714 A1C.wpd